lml

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 06-40068-07-JAR |
| | ) |
| JAMES MOSER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

MEMORANDUM AND ORDER

This matter is before the Court on defendant James Moser's Motion for Judgment of

Acquittal filed pursuant to Fed. R. Crim P. 29 (Doc. 512). The government has responded and

the Court is prepared to rule. For the reasons explained in detail below, defendant's motion is

denied.

I.      Factual Background

The initial Indictment in this case was returned on May 17, 2006, charging defendant

James Moser and eight others with fifty-three counts of bank fraud, five counts of money

laundering and conspiracy to commit the substantive charges. A First Superseding Indictment

was filed on August 8, 2007, adding an additional defendant. Prior to trial, five of these

defendants entered guilty pleas and agreed to cooperate by testifying at trial. Four defendants,

including Moser, stood trial beginning on January 12, 2010. The jury returned guilty verdicts

against Moser on conspiracy Count 1, and bank fraud Counts 30, 41, 44 and 45.[1] The jury

---

[1](Doc. 484.)

acquitted co-defendants F. Jeffrey Miller, Todd Earnshaw and Brian Rouse.[2]

## II.    Motion for Acquittal

At the close of the government's evidence, Moser orally moved for acquittal, arguing that

the evidence was insufficient to sustain a conviction on the counts in the First Superseding

Indictment.  Following the verdict, defendant filed this motion based on the sufficiency of the

evidence.  The Court considers all of these motions in this section.

On a motion under Fed. R. Crim. P. 29, the court may not weigh the evidence or assess

the credibility of the witnesses.[3]  "Rather, the Court must 'view the evidence in the light most

favorable to the government and then determine whether there is sufficient evidence from which

a jury might properly find the accused guilty beyond a reasonable doubt.'"[4]  "Acquittal is proper

only if the evidence implicating defendant is nonexistent or is 'so meager that no reasonable jury

could find guilt beyond a reasonable doubt.'"[5] Accordingly, as long as the jury's inferences and

conclusions are reasonable, the court will not disrupt the verdict.[6]  A motion for acquittal at the

close of the government's evidence looks only to the evidence adduced during the government's

presentation of its case.[7]

---

[2](Docs. 481-483.)  Prior to submitting the case to the jury, the Court dismissed Count 1 with respect to defendant Miller on double jeopardy grounds, ruling that the conspiracy in this case was the same as the conspiracy charged in Case No. 06-40151-JAR, in which defendant Miller was found guilty of conspiracy to commit bank fraud on December 18, 2008. (Doc. 476.)

[3]*United States v. Parker*, 521 F. Supp. 2d 1174, 1176 (D. Kan. 2007).

[4]*Id.* (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982)).

[5]*Id.* (quoting *White*, 673 F.2d at 301).

[6]*United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (citing *United States v. Rahserparian*, 231 F.3d 1257, 1262 (10th Cir. 2000)).

[7]Fed. R. Crim. P. 29; *United States v. Delgado-Uribe*, 363 F.3d 1077, 1082 n.3 (10th Cir. 2004).

### A.       Count 1—Conspiracy to Commit Bank Fraud

Moser claims that there was insufficient evidence to sustain the conviction that he

conspired to commit bank fraud.  To convict defendant of conspiracy to commit bank fraud, the

government was required to prove beyond a reasonable doubt, that: (1) the defendant agreed

with at least one other person to commit bank fraud; (2) a conspirator committed an overt act in

furtherance of that goal; (3) the defendant knew the essential purpose of the conspiracy; (4) the

defendant knowingly and voluntarily participated in the conspiracy; and (5) there was

interdependence among the co-conspirators.[8]

"'The core of a conspiracy is an agreement to commit an unlawful act.'"[9]  "'[T]he critical

inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that

the minds of reasonable men may conclude therefrom that an unlawful agreement exists.'"[10]

"The existence of the agreement to violate the law may be inferred from a 'unity of purpose or

common design and understanding' among conspirators to accomplish the objects of the

conspiracy."[11]  "Because '[s]ecrecy and concealment are essential features of successful

conspiracy,' direct evidence of conspiracy is often hard to come by."[12]  "Therefore, conspiracy

convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the

---

[8]*United States v. Weidner*, 437 F.3d 1023, 1033 (10th Cir. 2006).

[9]*Id*. (citing *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992) (quoting *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir. 1991))).

[10]*Id*. (citing *Morehead*, 959 F.2d at 1500  (quoting *United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir. 1985))).

[11]*Id*. (citations omitted).

[12]*United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)).

defendants' conduct and other circumstantial evidence indicating coordination and concert of action."[13]

To prove knowledge, the government does not have to show that defendant knew all the details of the conspiracy or even that defendant knew all the members of the conspiracy; rather, the government must show that the "'defendant shared a common purpose or design with his alleged coconspirators.'"[14] The government must show "'at least the degree of criminal intent necessary for the substantive offense itself.'"[15] "[M]ere knowledge or acquiescence in the purposes of the conspiracy is not sufficient to establish the defendant's willful entry into the conspiracy . . . . Instead, the government must establish 'informed and interested cooperation, stimulation, [or] instigation.'"[16] Finally, it does not follow that just because defendants did not succeed at the alleged conspiracy that they are not guilty of conspiring to break the law.[17]

In this case, the government alleged that the defendants conspired to commit bank fraud in violation of 18 U.S.C. § 1344(2). A conviction under § 1344(2) requires proof that "(1) the defendant knowingly executed or attempted to execute a scheme . . . (ii) to obtain property by a means of false or fraudulent pretenses, representations or promises; (2) that the defendant did so with the intent to defraud; (3) that the financial institution was [federally insured]; and (4) the false or fraudulent pretenses, representations, or promises were material, meaning they would

---

[13]*Id.* (citing *United States v. Hardwell*, 80 F.3d 1471, 1482 (10th Cir. 1996)).

[14]*United States v. Yelling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992)).

[15]*United States v. Weidner*, 437 F.3d 1023, 1033 (10th Cir. 2006) (citations omitted).

[16]*Id.* (citations omitted).

[17]*United States v. Wittig*, 575 F.3d 1085, 1104 (10th Cir. 2009) (citation omitted).

naturally tend to influence, or were capable of influencing the decision of the bank to obtain something of value, such as money."[18]

Moser contends that the government's evidence failed to show that he participated in or was aware of the actions of co-defendant Miller or his former partner James Frey in actions involved in the purchase of homes or working with buyers through the loan approval process and there is no evidence that he participated in or was aware of false statements to, or defrauding of financial institutions. The evidence at trial, however, went well beyond mere association with Miller and Frey.

The government established that this conspiracy involved defrauding financial institutions that loaned money to people who purchased houses built by co-defendant Miller, or built by other home builders on lots owned and developed by Miller, who created a "one-stop-shop" to market and sell his homes to buyers with credit problems. In June 1998, Miller created Associated Capital to process the loan applications, and Associated Finance to service his second mortgages on these homes. After legal action by state enforcement agencies, Miller began selling homes through Classic Realty, a straw company operated by co-defendant Judy Brumble, in order to circumvent certain Consent Judgments. Then, in 2002, after Miller could no longer market his homes directly to individual home buyers, he began selling his homes in bulk to investors. One of these investors was Moser, who together with Frey, entered into a partnership to purchase investment properties in 2002 and 2003. Frey, who died in June 2005, would purchase the properties either directly from Miller or through middlemen such as co-defendant Steve Middleton. The lenders were defrauded by loan applications that overstated Frey's

---

[18]*United States v. Rackley*, 985 F.2d 1357, 1360-61 (10th Cir. 1993) (footnote omitted).

income, financial history and strength, and included false lease/purchase agreements. The

lenders were also defrauded through omission: they were not told that the investors were induced

to purchase multiple residences in exchange for a discount price that was not disclosed on the

loan documentation. Investors were paid kickbacks out of loan proceeds, which were concealed

as referral fees and interior design fees. The result was that the lenders extended loans at a

higher loan-to-value ratio than their loan documentation indicated, to borrowers whose incomes

could not support the loan payments, and whose credit history indicated that they were poor risks

for payment. Most of the borrowers ultimately defaulted on the loans and foreclosure

proceedings followed.

At trial, several witnesses testified against Moser, including three of the five cooperating

co-defendants: Steve Middleton, Angela Parenza and Lanny Ross, all of whom plead guilty to

the conspiracy as charged in Count 1.[19] Six other witnesses gave testimony that related to

Moser: Ima Bennett, Jane May, Nancy Frey, Tony Hilger, Ron Darden and Doug Schneebli.

Angela Parenza ran Miller's office for a total of approximately seven years; her responsibilities

included keeping track of Miller's construction projects and records for tax purposes. Parenza

testified that Miller influenced the appraised values of all homes built in his subdivisions by his

companies or his affiliates. Parenza testified that on all the properties purchased by Frey, she

wrote out the contracts and knew that Frey was buying the properties with Moser.

Steve Middleton, a builder and owner of Somerset Homes, testified how Moser became

involved in the purchase of Miller homes and how Moser profited from the transactions.

Middleton testified that Moser set the price for the homes, and that the price on the sales contract

[19](Docs. 107, 223, 284.)

was not the "true" sales price. Instead, the contract price would be what Middleton believed he

or Miller could sell the house for, as well as what Moser believed he could get a bank to loan on

the property. The difference between the true sales price and the contract price would be paid in

kickbacks to Moser. Although initially Middleton and Miller paid Moser outside of closing,

Miller started putting the payments on the HUD-1 closing statement because Moser wanted his

money sooner. In order to accomplish this, Moser created false invoices to provide the title

company at closing, which claimed that he provided construction supervision and other

consultant services. Middleton testified that these invoices were false, as Moser did nothing to

earn these payments, aside from installing sprinkler systems on a few of the houses. Middleton

further testified that he kept records of legitimate construction costs expenses, none of which

show a payment to Moser. Moser received over $1.2 million either directly from Miller or

Middleton, or out of closing, for the transactions charged as bank fraud in Counts 29 through 47.

Loan officers Ron Darden and Doug Schneebli provided additional testimony

establishing that Moser and Frey conspired to submit false information to lenders. Darden, who

handled four of the Frey/Moser transactions, testified that he knew Frey, who introduced him to

Moser. Darden testified that he understood Moser and Frey were interested in purchasing

investment properties and that Moser told him they would be purchasing many houses direct

from the builder at a reduced price. Schneebli handled four other Frey/Moser transactions, and

testified that the records from the title company files would have been sent to the lender.

Evidence at trial showed that the income and employers listed on the various Frey/Moser loan

applications was false. In addition, on several Frey transactions, the loan package included a

copy of a lease/purchase agreement that falsely indicated that Frey was leasing his house and

included the income as an outstanding liability.

After the partnership with Frey ended, the government presented evidence that Moser continued his role in the conspiracy by using the services of Ima Bennett, who worked as a loan processor and plead guilty to a separate mortgage fraud conspiracy. Bennett testified about her role in falsifying information provided to lenders in the transactions charged in Counts 48 and 50 through 54, detailing how she had to inflate the borrowers' income in order to adjust the debt-to-income ratio in order to qualify the borrowers. Bennett testified that she falsely claimed on the loan applications that the properties would be owner-occupied and that she falsified documents that went to the lenders, such as false rent free letters and false lease agreements. This evidence supports Moser's knowledge and intent during this phase of the conspiracy. The three buyers in these transactions, Kara Franks, Shellie Nelson and Emma Holmes, were buying multiple residences in a short period of time from James Moser & Associates, Somerset Homes and James and Doris Moser. Moser received substantial sums from all of these sales by artificially inflating the value of the properties. Bennett testified that she was to call Lanny Ross, who acted as an appraiser on the transactions charged in Counts 50 through 54. Ross testified that the comparables he used on these properties were provided by Moser, who told Ross what he needed the values to be. Ross testified that it was implied that if he did not use Moser's value, then Ross would not get Moser's business. Ross further testified that he used a copy of his supervisory appraiser's seal on the appraisals, which his supervisor was unaware, and that his actions could have cost him his appraiser's license.

Viewed as a whole, this evidence permits the conclusion that Moser knowingly entered into an agreement to commit bank fraud. The circumstantial evidence required to support a

verdict need not conclusively exclude every reasonable hypothesis except guilt.[20]  There is

sufficient evidence, when viewed in the light most favorable to the government, that Moser

agreed with at least one other person to commit bank fraud, knowing the essential purpose of the

conspiracy, and that he knowingly and voluntarily participated, acting with interdependence.

Because the government proved this beyond a reasonable doubt, Moser's motion is denied with

respect to Count 1.

**B.       Counts 30, 41, 44 and 45—Bank Fraud**

Moser was also convicted of bank fraud in violation of 18 U.S.C. § 1344(2), as charged

in Counts 30, 41, 44 and 45.  "The bank fraud statute contains virtually the same language as the

[federal] mail and wire fraud statutes," and, like those statutes, "courts have construed the bank

fraud statute liberally."[21]  To prove bank fraud, the government must prove beyond a reasonable

doubt that "(1) the defendant knowingly executed or attempted to execute a scheme . . .  (ii) to

obtain property by a means of false or fraudulent pretenses, representations or promises; (2) that

the defendant did so with the intent to defraud; (3) that the financial institution was [federally

insured]; and (4) the false or fraudulent pretenses, representations, or promises were material,

meaning they would naturally tend to influence, or were capable of influencing the decision of

the bank to obtain something of value, such as money."[22]  Under § 1344(2), "'if a defendant

knowingly provided materially false information in order to induce the loan, the crime is

_____

[20]*United States v. Clark*, 57 F.3d 973, 976 (10th Cir. 1995).

[21]*United States v. Young*, 952 F.2d 1252, 1255-56 (10th Cir. 1991).

[22]*United States v. Rackley*, 985 F.2d 1357, 1360-61 (10th Cir. 1993) (footnote omitted).

complete.'"[23]  Therefore, even if the decision maker did not rely on the fraudulent information, it

is still a violation of § 1344(2) to submit false information.[24]  The government is not required to

prove that a defendant put a bank "at risk" to sustain a conviction under § 1344(2).[25]

Moser argues that the government's evidence was insufficient to find him guilty beyond a

reasonable doubt on these four substantive charges.  Moser contends that the fact that he and

Frey were in a business relationship does not prove that Moser had any knowledge of, or

participation in, Frey's actions involved in the purchase of the homes, and that these loan

documents were prepared by Frey.  In focusing on the evidence presented specifically to each

count of conviction, however, Moser fails to acknowledge that in order to convict a defendant of

a violation of § 1344(2), the government is not required to prove that the defendant made the

false or fraudulent submissions himself, as the government alleged that Moser conspired to

commit bank fraud as well as aided and abetted in that offense.[26]

In this case, the evidence discussed in addressing Moser's challenge to the conspiracy

conviction provides sufficient support for the § 1344(2) convictions alleged in Counts 30, 41, 44

and 45.  The loan applications addressed in those counts all contained false or fraudulent

information regarding Frey's income and employers.  Specifically, the loan application in Count

30 included copies of checks to Frey purportedly for payroll from a company called Advanced

---

[23]*United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995) (quoting *United States v. Hollis*, 971 F.2d 1441, 1452 (10th Cir. 1992)).

[24]*See generally id*. (finding a violation even though the forged documents submitted to the bank were not necessary to obtain the funds); *see also United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000).

[25]*Sapp*, 53 F.3d at 1103; *but cf. Young*, 952 F.2d at 1257 (holding that the government must also prove that "the bank was put at potential risk by the scheme to defraud" in order to establish a violation of § 1344(1)).

[26](Doc. 479, Instruction Nos. 31, 33.)

Composite Technologies ("ACT").[27]  The loan application stated that Frey had been employed

by ACT as vice president of marketing for one year, with a monthly income of $14,827.00.[28]

Jane May, who worked for ACT, testified that she was asked by National City Mortgage to

research these paychecks and discovered that they were not payroll checks and had been issued

to someone other than Frey in amounts different than those shown on the checks.[29]  In Counts 41,

44 and 45, the loan applications listed Frey's employer as James Moser and Associates, making

$17,000 per month, with additional income from a second job at KC Masters, making $3,662 per

month.[30]  A letter dated November 26, 2002, from James Moser and Associates confirming

Frey's employment and yearly salary of $204,000 was included in these transactions.[31]  Frey's

widow, Nancy Frey, testified that her husband and Moser were "partners," and that Frey worked

for neither of these employers.  Checks offered into evidence by Moser are not consistent with

the purported payroll check stubs that were submitted to the financial institutions.[32]  And, in all

of the transactions in Counts 30, 41, 44 and 45, the loan package contains a copy of a

lease/purchase agreement between Tony Hilger and Joseph Fry [sic] for a property that was

Frey's residence in Lee's Summit, Missouri.[33] The agreement provided that Hilger would pay

Frey $2500 rent on the property each month, and was included as net rental income on Frey's

---

[27]Tr. Ex. 30D.

[28]Tr. Ex. 30B.

[29]Tr. Ex. 30R.

[30]Tr. Exs. 41B, 44B, 45B.

[31]Tr. Exs. 41H, 44G, 45H.

[32]Tr. Exs. 744-4, 744-5.

[33]Tr. Exs. 30T, 41E, 44E and 45E.

11

loan applications.[34]  Hilger testified that this lease agreement was false and Hilger had never

rented a house from Frey or Moser.  Hilger did not know Frey, but had worked with Moser for a

short period of time, and knew that their boss had leased a house from Moser.  The government's

evidence established that these documents would have been submitted to the various financial

institutions as part of the loan application package.

Based on these false representations, a jury reasonably could conclude that the

submission of these false and fraudulent loan application documents was a foreseeable

consequence of the conspiracy and committed in furtherance of the conspiracy to commit bank

fraud charged in Count 1.  Moser's motion for judgment on the verdict is denied as to these

counts.  Because the evidence is sufficient to support that Moser was a member of that

conspiracy, a jury could properly convict him for the submission of those documents addressed

in the substantive bank fraud counts, even though he was not the buyer in those loan

transactions.[35]

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for

Judgment of Acquittal (Doc. 512) is DENIED.

---

[34]*Id.*

[35]*See United States v. Weidner*, 437 F.3d 1023, 1039 (10th Cir. 2006) (citing *United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992) ("During the existence of a conspiracy, each member of the conspiracy is legally responsible for the crimes of fellow conspirators . . . that are committed in furtherance of the conspiracy.") (citing *Pinkerton v. United States*, 328 U.S. 640, 646-49 (1946)); *see* Doc. 479, Instruction No. 33.  Alternatively, the evidence was sufficient to show that Moser aided and abetted in the commission of the substantive bank fraud counts, which required the government to prove that someone else committed the charged crime and that defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about.  *See United States v. Anderson*, 189 F.3d 1201, 1207 (10th Cir. 1999).

IT IS SO ORDERED.


Dated: July 10, 2010                                S/ Julie A. Robinson
                                                   JULIE A. ROBINSON
                                                   UNITED STATES DISTRICT JUDGE